**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARK W. MAYHEW,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:14-cv-1653** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **TOWN OF SMYRNA, TENNESSEE and** | ) | |
| **HARRY GILL,** | ) | |
| | ) | |
|     **Defendants.** | ) | |

## MEMORANDUM

The defendants have filed a Motion for Summary Judgment (Docket No. 30), to which

the plaintiff has filed a Response (Docket No. 37), the defendants have filed a Reply (Docket No.

46), and the plaintiff – with leave of court – has filed a Sur-Reply (Docket No. 52).  For the

following reasons, the motion will be granted.

## FACTS[1]

The plaintiff, Mark Mayhew, is a resident of Murfreesboro, Tennessee and a former

employee of Smyrna, Tennessee's wastewater treatment plant (the "Plant").  The defendant

Town of Smyrna, Tennessee ("Smyrna") is a municipal corporation organized under the laws of

the State of Tennessee and located in Rutherford County, Tennessee.  The defendant Harry Gill

---

[1] Unless otherwise noted, the facts recounted in this section are drawn primarily from the defendants' Statement of Concise Material Facts (Docket No. 32), Mayhew's response thereto (Docket No. 38), Mayhew's Statement of Additional Material Facts (Docket No. 41), and the defendants' response thereto (Docket No. 48).  This section also contains facts from the defendants' Motion for Summary Judgment and Memorandum of Law in Support thereof (Docket Nos. 30 and 31), Mayhew's Response Memorandum (Docket No. 37), and the defendants' Reply (Docket No. 46), that are not refuted or contradicted by the opposing party or the record.  Where there is a genuine dispute of fact, the court will present the fact in the light most favorable to Mayhew as the non-moving party.

has been Smyrna's Town Manager from November of 2013 through the present. This case arises

from Mayhew's allegation that the defendants terminated his employment at the Plant because he

refused to participate in, or remain silent about, misconduct relating to the falsification of Plant

data by fellow Plant employees.

I.      **The Plant and Mayhew's Employment**

Smyrna owns and operates the Plant, which processes and treats wastewater and then

releases it into public waterways. The Plant is subject to both federal and state regulation. The

U.S. Environmental Protection Agency (the "EPA") requires, among other things, that the Plant

submit to the EPA an annual sludge report containing data about the treated wastewater the Plant

discharges. The Tennessee Department of Environment and Conservation ("TDEC") requires

the Plant to maintain a national pollutant discharge elimination system ("NPDES") permit in

order to operate in Tennessee. At all times relevant to this case, the Plant held a NPDES permit

issued by TDEC. The NPDES permit sets parameters that limit the amounts of certain chemical

compounds that can be discharged into public waterways by the Plant in its treated water. The

permit also requires Smyrna, as operator of the Plant, to report to TDEC a number of different

test results based on the analysis and testing of samples of water and other byproducts collected

during the treatment process. In addition to internal Plant logs and documents, these test results

are recorded in "monthly operating reports" ("MORs") and monthly discharge monitoring

reports ("DMRs"), each of which are signed and sent to TDEC each month. Also, pursuant to

TDEC regulations, any violation of a parameter in a NPDES permit must be reported.

Approximately twelve employees work at the Plant, and they are each supervised by one

of three supervisors: the Chief Operator, the Lab Supervisor, or the Maintenance Supervisor.

Each of these three supervisors reports directly to the Plant Manager, who oversees the overall

operations of the Plant, and they have no supervisory authority over each other. The Plant

Manager reports to the heads of Smyrna's utilities department – the Director of Utilities, Mike

Strange, and the Assistant Director of Utilities, Mark Parker – who, in turn, report directly to the

Town Manager, Gill. As Town Manager, Gill oversees the overall operation of Smyrna, and he

has the ultimate authority to terminate the employment of any Smyrna employee, including any

employee of the Plant.

Mayhew worked at the Plant from August 18, 1995 to July 7, 2014, when he was

terminated by Gill. From November 6, 1997 until his termination, Mayhew worked as the

Plant's Lab Supervisor and Pre-Treatment Coordinator. In this position, Mayhew was

responsible for the supervision of all laboratory personnel and their work, including the

collection and analysis of samples used in the treatment testing process. The collection and

calculation of information related to these test results was recorded on internal logs and on the

MORs and DMRs that were sent to TDEC each month, in accordance with the Plant's NPDES

permit. It also appears that these test results were recorded on the annual sludge report that was

sent to the EPA each year.

As acknowledged by Mayhew, his duties as Lab Supervisor were "set forth in a detailed

written job description." (Docket No. 37, p. 2.) According to the job description, his duties

included: (1) overseeing the performance of "all necessary laboratory work required" for the

Plant's NPDES permit, including the preparation and submission of MORs, DMRs, and

violations reports to TDEC;[2] (2) monitoring laboratory activities regularly to ensure compliance

with "proper procedures and documentation;" and (3) ensuring that quality control "meets or

exceeds the standards of EPA and [TDEC]." (Docket No. 33-3 (Lab Supervisor Job

---

[2] As Lab Supervisor, Mayhew did not have the authority to sign these reports on behalf of
Smyrna – only the Plant Manager did.

Description).)  In addition, Mayhew had various duties related to the maintenance and review of the Plant's internal records, including: documenting and reviewing all laboratory work; entering and updating files on the computer "for preparing reports, spreadsheets, historical information, maintenance records and letters;" maintaining records in compliance with "Federal, State and City regulations;" and reviewing laboratory records "to ensure accuracy and completeness." (*Id.*)  Finally, Mayhew was required to "review and document all OSHA, Federal, State and City regulations, as they impact the wastewater treatment plant laboratory and report any appropriate situations and accidents immediately to management."  (*Id.*)

In addition to these duties, Mayhew was required by Smyrna to hold a grade IV wastewater treatment certification issued by TDEC.  This certification requires its holder to comply with "the laws, rules, permit requirements or orders of any governmental agency or court which govern the water supply system or the waste water system [he] operates." (Docket No. 38 ¶ 72 (quoting TDEC Rule 0400-49-01.11).)  TDEC may revoke an operator's certificate if he, or any person under his supervision, intentionally or negligently fails to "comply with the monitoring, sampling, analysis, or reporting requirements" for his facility or "to notify [TDEC] of conditions . . . which are violative of a standard of water quality promulgated by any governmental agency."  (*Id.* ¶¶ 73–74 (same).)  Finally, TDEC rules state that a certified operator "shall be deemed to have practiced fraud or deception" if he "has not used reasonable care, judgment, or the application of his[] knowledge" in the preparation of reports submitted to the agency, causing them to contain inaccurate data.  (*Id.* ¶ 75 (same).)  At all times relevant to this action, Mayhew was required to, and did, hold the required grade IV treatment certification.

## II.     Mayhew Uncovers and Begins to Report Violations at the Plant

The parties appear to agree that the Plant could be a "harsh environment, with very

difficult work," "personality conflicts existed between employees," and "employees in each department [of the Plant] stuck with their co-workers in the same department." (Docket No. 38 ¶ 102.) Many of the allegations in this action relate to conflict between Mayhew and another long-time Plant employee, Leland Noble, who was Chief Operator at the Plant in early 2014. At that time, Mayhew and Noble had already had a strained working relationship for several years. Mayhew alleges that the final breaking point in their relationship took place in early 2014, when Noble engaged in the following improper, if not illegal, conduct:

- pressuring Mayhew to change numbers or falsify data submitted to TDEC and the EPA in order to hide NPDES permit violations;

- refusing to allow Mayhew to collect samples that were necessary to obtain the data that had to be submitted to TDEC and the EPA;

- changing or falsifying various data;

- pressuring Mayhew to collect samples more often than necessary so that "bad numbers" could be thrown out;

- telling Mayhew to refrain from collecting samples or reporting test results as required on certain days so as to "cherry pick" the data and make the Plant look better;

- reporting that he had performed tests that had not been performed; and

- engaging in other conduct involving falsifying, changing, omitting or selecting data and pressuring Mayhew to participate in such conduct.

(Docket No. 48 ¶ 3.) Mayhew claims that Noble's conduct increased in intensity and frequency over time, until the pressure being applied to Mayhew was "almost [on] a daily basis." (*Id.* ¶ 4.)

In February of 2014, Mayhew began reporting Noble's conduct to the Plant Manager at the time, Mike Roberts. Mayhew has indicated that, during this time, he believed that he was "working within the chain of command" by bringing his concerns to the Plant Manager. (Docket No. 38 ¶ 86.) Mayhew continued to report these issues to Roberts throughout March, April, and May of 2014, and Roberts conducted a small investigation into the matter by speaking to Plant

employees and inspecting the operator's area and data.

Mayhew provides very little detail regarding his reports to Roberts other than to say that he reported these issues "through July 7, 2014." (Docket No. 48 ¶ 3.) Mayhew does not identify – nor can the court find – any portion of the record that contains information regarding specific instances of misconduct by Noble, the discovery by Mayhew of any instances of Noble's misconduct, or Mayhew's reporting of any of these instances of misconduct to Roberts. According to Mayhew's testimony, however, it appears that much of his reporting of Mayhew's misconduct was precipitated by a discrepancy in data that Mayhew noticed in the course of logging dewatered sludge data in his work computer at some point in March of 2014. (Docket No. 40-2 (Dep. M. Mayhew, v. 2), 208:10–209:5.) Mayhew acknowledges that he regularly logged this data in the course of his work at the Plant. (*Id.* at 209:23–210:18.)

Mayhew contends that, "while reporting violations to TDEC on MORs and DMRs and to the EPA in sludge reports was part of Mayhew's ordinary job duties, reporting Noble's conduct to Strange, Parker, [Smyrna Director of Human Resources] Craig, and Gill was not." (Docket No. 37, p. 9.) In support of this argument, Mayhew points only to his own testimony, stating: "[t]his is something completely separate and outside my normal job official duties," "it's really not a part of my daily duties or official duties to report [the falsification of data] to management or anyone," and "reporting illegal activity such as this contained within the department is not part of my job description." (Docket No. 40-1 (Dep. M. Mayhew, v.1), 119:1–5; Docket No. 40-2 (Dep. M. Mayhew, v.2), 202:9–15, 202:24–203:3; 217:21–22.)[3] Rather, Mayhew contends that

---

[3] In support of this argument, Mayhew also cites certain pages of his deposition testimony (Docket No. 37, p. 9), but these pages contain only descriptions of the information that must be reported to TDEC and the EPA in monthly and annual reports; they do not contain any description of Mayhew's actual job duties at the Plant. (Docket No. 40-1 (Dep. M. Mayhew, v.1), 143–44; Docket No. 40-2 (Dep. M. Mayhew, v.2), 210.)

he reported this information "as a moral duty outside my normal job description as a concerned citizen . . . ."  (Docket No. 40-2 (Dep. M. Mayhew, v.2), 213:2–6.)

### III.   Mayhew Escalates His Reports Up the Chain of Command

In June of 2014, Roberts was suspended and ultimately resigned, and the Plant Manager position was left temporarily vacant.  After Roberts' suspension, Mayhew began to report Noble's misconduct directly to the heads of the utilities department, Parker and Strange.  According to Mayhew, he made these reports both through conversations he initiated as well as during a series of Plant employee interviews initiated by Parker and Strange in mid-June of 2014, related to Roberts' suspension.  While Roberts' suspension was completely unrelated to the misconduct Mayhew was reporting, Mayhew took advantage of these interviews – specifically meetings on June 11, 16–19, 26, and 30, 2014 – to raise with Parker and Strange the same concerns that he had reported to Roberts regarding Noble's alleged misconduct as well as his concerns about Noble's dishonesty and his unsuitability for the soon-to-be-vacant position of Plant Manager.  At the meeting on June 17, Noble was also present, and he and Mayhew argued with each other.  Mayhew stated during the meeting that he did not trust Noble.  (Docket No. 42-1 (June 17, 2014 Meeting Notes), p. 8.)  Parker and Strange later advised Mayhew that they had reported the content of the interviews to Gill.  Gill has acknowledged that he was aware that Mayhew had reported the falsifying of data to Parker and Strange "on multiple occasions" in June of 2014.  (Docket No. 48 ¶¶ 13–14.)

At some point in June or early July of 2014, Mayhew also discussed the violations at the Plant with others within the utilities department, such as Lloyd Johnson, the Plant's Maintenance Supervisor, and Aubrey Blanks, a utilities operation manager.  Mayhew further discussed the violations with several individuals outside of the Plant, namely his family, an attorney, and

former Plant employee Dwight Jeans. Mayhew has not, however, pointed to any evidence in the record – nor can the court locate any – suggesting that Gill was aware of Mayhew's discussions of Plant violations with anyone other than Roberts, Parker, and Strange. At no time did Mayhew report any of the alleged Plant violations to the press or to TDEC, the EPA, or any other outside agency. It is undisputed that Mayhew (1) sent no written communication to TDEC regarding his allegations and (2) did not speak with anyone at TDEC about the alleged violations at the Plant, despite having interacted with at least three TDEC employees in the past.

On June 27, 2014, Gill appointed Noble to the position of Plant Manager. Gill then promoted his nephew, Kyle Gill, to Noble's vacated position, Chief Operator. The Plant Manager and Chief Operator positions were not posted or advertised as being available, and neither Noble nor Kyle Gill had to apply for the positions, which Mayhew contends – and the defendants dispute – is a violation of Smyrna's Equal Employment Opportunity policy, as well as Smyrna's custom and practice. No one else, either inside or outside of Smyrna, had an opportunity to apply, interview, or be considered for either position. Neither Noble nor Kyle Gill possessed all of the qualifications listed in the job descriptions for their new respective positions: Noble did not have a college degree, and Kyle Gill did not have the requisite experience or collection certification from TDEC.

After the appointments of Noble and Kyle Gill, Mayhew believed that his "reporting of concerns was being ignored," and he was concerned about his job security. (Docket No. 37, p. 8.) As a result, on July 1, 2014, Mayhew emailed Strange and Parker to "clarify and document issues at [the Plant]." (Docket No. 33-2.) Specifically, Mayhew's email complained about Noble's "being placed in [a] position of authority over [him] as the new [Plant] Manager . . . ." (*Id.*) Mayhew stated that he found it "disturbing" that Gill would "promote

someone that is clearly responsible for the present working conditions of having to work in an environment of possible retaliation which include[s] hostilities in the workplace . . . ." (*Id.*) He then noted that the issues with the promotion were "magnifie[d]" by the fact that "management was alerted to issues with Mr. Noble" and that Noble was "the very same person that put pressure on [him] to hide violations, of which [he] refused to do." (*Id.*) Mayhew further stated that he felt Noble "will hide NPDES violations if he thinks he can get away with it." (*Id.*) Mayhew additionally alleged that Smyrna "applied unfair and unequal practices in filling the two highest paid positions at the [Plant] on 6/27/2014," when Gill "bypassed normal hiring procedures to promote his nephew, Kyle Gill, as well as align him for the [Plant] Manager position," and promoted Noble to the Plant Manager position, for which "he didn't have to apply . . . or meet qualifications." (*Id.*) Mayhew's email also noted that his meetings with Parker and Strange "helped make things better in the department," but he worried that Noble would take "hostile action" against him as soon as Parker and Strange were no longer regularly at the Plant. (*Id.*) Mayhew underscored this statement in his email: "I find it difficult to team up with someone like Leland Noble who's [sic] integrity is such that it compromises my own ethics and honest efforts in doing my job." (*Id.*) Mayhew complained that Noble's promotion had "suddenly placed [him] in a precarious position" and that he expected that Noble would "attempt to get rid of [him] and replace [him] with someone he can control and manipulate." (*Id.*) Mayhew stated that he thought Noble would "retaliate against [him] as it is just [Noble's] nature," and said: "This is why I feel it necessary to document." (*Id.*) Lastly, Mayhew requested that his email be forwarded to Craig (Smyrna's Director of Human Resources).

## IV.    <u>Mayhew Is Discharged</u>

After he received Mayhew's July 1, 2014 email, Strange forwarded it to Gill, who was on

vacation for the July 4th weekend. Gill was offended by the email, finding it to be "insubordinate and disrespectful" (Docket No. 48 ¶ 45) – and he directed Strange to suspend Mayhew. Mayhew was provided with an "Investigation and Administrative Leave Notice," which stated that he was being placed on paid leave because of Smyrna's "concerns of public safety and the presented issues surrounding [his] statements in the [email], to include the inability to work under the supervision" of Noble. (*Id.* ¶ 53.) No one consulted with Smyrna's Director of Human Resources before placing Mayhew on administrative leave. The defendants contend that Mayhew was placed on administrative leave because Gill was concerned "about [Mayhew]'s willingness to work with Noble and carry out his job responsibilities without hostility to Noble or others on staff." (Docket No. 38 ¶ 198.) Mayhew, on the other hand, argues that he was placed on leave because of his reports of violations at the Plant and the allegations in his July 1, 2014 email. (Docket No. 48 ¶ 54.)

On July 7, 2014, Gill met with Mayhew, Strange, Craig, and Jeff Peach, the Smyrna Town Attorney at the time. Gill began the meeting by telling Mayhew that he was "upset" that Mayhew had reported his concerns in his July 1st email and specifically said: "We will see if you still have a job today." (Docket No. 40-2 (Dep. M. Mayhew, v.2), 303:13–22; Docket No. 48 ¶ 59.) During the meeting, Gill accused Mayhew of being bitter about Noble's promotion, to which Mayhew responded: "No, sir, I'm not bitter toward him. This has nothing to do with personal issues. It has to do with what I reported." (*Id.* at 304:16–21.) Gill then accused Mayhew of being insubordinate and asked Mayhew multiple times if Mayhew could work with Noble. According to Mayhew, he never refused to work with Noble and, instead, responded multiple times that he would "do [his] very best." (*Id.* at 298:15–23.) During the meeting, Gill did not assure Mayhew that he would investigate Mayhew's concerns nor that Mayhew would be

safe from retaliation for raising those concerns.

At the end of the July 7, 2014 meeting, Gill discharged Mayhew without consulting with Human Resources or other Plant or Smyrna management. Mayhew alleges that he was discharged for speaking out regarding the violations at the Plant and Gill's circumvention of Smyrna's hiring policies, and/or for refusing to remain silent about, or participate in, this allegedly illegal conduct. (Docket No. 48 ¶ 86.) The defendants, on the other hand, contend that Mayhew was discharged, not for his reports of illegal conduct at the Plant or for his July 1, 2014 email, but "because there was not a full declaration [at the meeting] [Mayhew] was willing to work with Noble." (Docket No. 38 ¶ 204.)

## PROCEDURAL HISTORY

On August 12, 2014, approximately one month after he was discharged, Mayhew filed suit against Smyrna and Gill, raising the following claims: (1) a claim for violation of Mayhew's First Amendment rights based on allegations that the defendants terminated him in retaliation for protected speech, brought under 42 U.S.C. §1983, and (2) a claim for violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, based on allegations that the defendants terminated Mayhew in retaliation for his refusal to remain silent about, or participate in, violations of federal and state laws and regulations. (Docket No. 1.) Mayhew requests back and front pay, compensatory and punitive damages, and attorneys' fees and expenses. (*Id.* at p. 9.) On September 29, 2014, the defendants each filed an Answer. (Docket Nos. 8, 9.)

Discovery closed on September 4, 2015 (Docket No. 24) and, on September 22, 2015, the defendants jointly filed a Motion for Summary Judgment, along with an accompanying Memorandum in Support, a Statement of Undisputed Material Facts, and a Notice of Filing with attached exhibits in support of the Motion (Docket Nos. 30–34). On November 4, 2015,

Mayhew filed a Response in opposition to the motion, along with a Response to the defendants' Statement of Undisputed Material Facts, a Statement of Additional Material Facts, and a Notice of Filing attaching a variety of deposition transcripts and exhibits. (Docket Nos. 37, 38, 40–42.) After court-approved extensions of the deadlines for filing, the defendants filed a Reply and a Response to Mayhew's Statement of Additional Facts. (Docket Nos. 46, 48.)

On November 23, 2015, with leave of court, Mayhew filed a Sur-Reply. (Docket No. 52.) Though Mayhew had only requested the court's leave to address the defendants' argument that the Supreme Court has not narrowed the reach of *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), the seminal case on the public employee exception to First Amendment protection, Mayhew's Sur-Reply raises for the first time the following arguments: (1) that the question of whether his speech was made in furtherance of his ordinary responsibilities is a question of fact that should be reserved for the jury; (2) his allegations regarding the promotions of Noble and Kyle Gill are, on their own, actionable under the First Amendment; and (3) that Gill's alleged violation of Smyrna's hiring policies resulted in the "misuse of Town funds." (Docket No. 52, pp. 2–5.) On November 24, 2015, the defendants filed a Joint Motion to Strike Mayhew's Sur-Reply under Federal Rule of Civil Procedure 12(f), arguing that it: (1) fails to raise any arguments responsive to the Reply that would warrant the submission of a sur-reply, and (2) improperly raises legal arguments based on allegations and theories of the case that are not contained in the Complaint. (Docket Nos. 54 and 55.) The court denied the defendants' Joint Motion to Strike, noting that Rule 12(f) is not a proper procedural device for striking material other than pleadings, and concluding that the court will instead "disregard any material that is improperly included in the Sur-Reply from its consideration of the defendants' Motion for Summary Judgment." (Docket No. 57.)

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

### I.  First Amendment Retaliation Claim

A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in

that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by his protected conduct." *Mills v. Williams*, 276 F. App'x 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Public employees such as Mayhew generally have "no right to object to conditions placed upon the terms of employment – including those which restrict[] the exercise of constitutional rights," but "[t]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417 (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)); *accord Keeling v. Coffee Cnty., Tenn.*, 541 F. App'x 522, 526 (6th Cir. 2013). Accordingly, the Sixth Circuit has held that a public employee's speech is constitutionally protected if (1) in making the speech, the employee was speaking as a citizen, and not as a public employee acting in furtherance of his ordinary responsibilities; and (2) the speech was on a matter of public concern. *See Boulton v. Swanson*, 795 F. 3d 526, 531–32, 534 (6th Cir. 2015). A public employee has "no First Amendment cause of action based on his . . . employer's reaction" to speech that was not made as a private citizen on a matter of public concern and is, therefore, not constitutionally protected. *Garcetti*, 547 U.S. at 418.

The question of whether a public employee engaged in constitutionally protected speech is a question of law that is determined by the court. *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350–51 (6th Cir. 2010); *see also Stinebaugh v. City of Wapakoneta*, No. 14-4262, 2015 WL 7003757, at *3 (6th Cir. Nov. 10, 2015) ("[W]hether an employee engaged in constitutionally protected speech . . . is a question of law . . . ."); *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012) ("[W]e have consistently described the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law, not

one of both fact and law." (quoting *Fox*, 605 F.3d at 350)).  Accordingly, the court now looks to whether any of Mayhew's speech that underlies this action can support his First Amendment claim, as a matter of law.[4]

### A.     Mayhew's Statements Regarding Violations at the Plant

Mayhew does not dispute that he is a public employee, but he argues that he spoke as a private citizen on a matter of public concern when he reported that Plant data was being falsified, changed, omitted, and improperly selected and that Noble was pressuring him to engage in such conduct.  It does appear that Mayhew's statements regarding violations at the Plant could have addressed a matter of public concern (as the defendants have conceded), but, for the reasons discussed below, the court concludes that Mayhew did not speak as a private citizen in making these reports but, rather, spoke as a public employee in furtherance of his job duties.  Since a public employee's speech is only protected by the First Amendment when both elements are met – that he spoke on a matter of public concern *and* as a private citizen – Mayhew's reports are not protected under the First Amendment.

---

[4] Mayhew appears to argue – relying on cases from other circuits – that the question of whether his speech was made in furtherance of his ordinary responsibilities is a question of fact that should be reserved for the jury.  (*See* Docket No. 52, pp. 2–3.)  First, the court notes that this argument was improperly raised for the first time in Mayhew's Sur-Reply and, therefore, should not be considered by the court.  (*See* Docket No. 57 (Order on Defendant's Motion to Strike Plaintiff's Sur-Reply).)  Nevertheless, the Sixth Circuit has recently indicated – without explicitly stating – that it will continue its long-standing practice of treating the question of whether certain speech is constitutionally protected to be a question of law and not one of fact. *See Fox*, 605 F.3d at 350–51 (finding that the circuit split cited by Mayhew is "ultimately irrelevant" to the disposition of its case and concluding that "[i]n our post-*Garcetti* opinions we have consistently described the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law, not one of both fact and law"); *see also Leavey v. City of Detroit*, 467 F. App'x 420, 427 (6th Cir. 2012) ("[W]e must decide as a question of law whether Plaintiff was speaking as a citizen or as part of her official duties as the Interim Corporation Counsel.").

The standard for determining when a public employee's speech is exempted from First Amendment protection was initially explained by the Supreme Court a decade ago in *Garcetti*, which held that a public employee does not speak as a citizen when his speech "owes its existence to the public employee's professional responsibilities." 547 U.S. at 421–22. After *Garcetti*, many courts read this exception to First Amendment protection overly broadly, to the point that a public employee's speech could be left unprotected, even when there was no real relationship between the employee's speech and his actual job duties. *See Boulton*, 795 F.3d at 533 (reversing a district court that read *Garcetti* too broadly). The Supreme Court recently addressed the breadth of the *Garcetti* exception in *Lane v. Franks*, 134 S. Ct. 2369 (2014), where it expressly rejected an overly expansive reading. The Court reasoned that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," and a "critical question" was "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379.

The parties disagree vehemently over the extent to which *Lane* narrowed the public employee exception to First Amendment protection stated in *Garcetti* (if at all). (*See* Docket No. 37, pp. 19–21; Docket No. 46, p. 2; Docket No. 52, pp. 1–3.) Indeed, in the year since *Lane* was decided, many federal courts have struggled to describe *Lane*'s impact on the *Garcetti* exception. The Sixth Circuit has, however, explicitly stated that the current standard for determining whether a public employee's speech is protected under the First Amendment is as follows:

> After *Lane*, the *Garcetti* exception to the First Amendment protection for speech residing in the phrase "owes its existence to a public employee's professional responsibilities" must be read narrowly as speech that an employee made *in furtherance of the ordinary responsibilities* of his employment.

*Boulton*, 795 F.3d at 534 (emphasis added). The court, therefore, must determine whether

Mayhew's reports that Plant data was being manipulated, and that Noble was pressuring him to engage in such conduct, were made in furtherance of his ordinary responsibilities at the Plant. To determine whether a statement was made in furtherance of an employee's ordinary responsibilities, courts consider its content and context, including "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Stinebaugh*, 2015 WL 7003757, at *6 (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)); *Alomari v. Ohio Dep't of Pub. Safety*, No. 14-3922, 2015 WL 5255139, at *8 (6th Cir. Sept. 9, 2015).[5] Other relevant, but not dispositive, factors include where the speech occurred (inside or outside of the workplace) and "if the speech is ordinarily within the scope of the speaker's duties." *Stinebaugh*, 2015 WL 7003757, at *6 (citing *Garcetti*, 547 U.S. at 420–21; *Lane*, 134 S. Ct. at 2379).

The court, therefore, must determine whether – based on the facts presented in the light most favorable to the plaintiff – the impetus for Mayhew's statements, the setting in which they were made, their audience, and their subject matter demonstrate that they were made in furtherance of Mayhew's ordinary responsibilities as Lab Supervisor. It is clear that the subject matter of the statements was closely related to Mayhew's job responsibilities. There does not appear to be any dispute that Mayhew's job duties – as listed in his job description – included: overseeing all laboratory work required for the Plant's NPDES permit, including the testing and sampling he claims he was pressured to change or skip; monitoring laboratory activities to ensure

---

[5] The court notes that the *Boulton* opinion did not include these factors (impetus, setting, audience, and subject matter) in its description of how to determine whether a public employee's speech was undertaken in furtherance of his ordinary job responsibilities, but the opinion also did not indicate that the Sixth Circuit intended to abandon these factors in the analysis, which it has continued to use since the publication of the *Boulton* opinion in July 2015. *See Stinebaugh*, 2015 WL 7003757, at *6 (November 2015); *Alomari*, 2015 WL 5255139, at *8 (September 2015).

proper procedures and documentation; preparing MORs, DMRs, and violations reports; and ensuring that quality control in the Plant met or exceeded EPA and TDEC standards. (Docket No. 33-3 (Lab Supervisor Job Description).). According to the job description, Mayhew's duties also included maintaining laboratory records, such as those he claims were being falsified, in compliance with federal and state regulations and reviewing those records to "ensure accuracy and completeness." (*Id.*) Finally, it appears from the job description that, as Lab Supervisor, Mayhew was required to "report any appropriate situations and accidents" in connection with federal and state regulations – presumably including those promulgated by the EPA and TDEC – "immediately to management." (*Id.*)

Nor does there appear to be any dispute of fact as to Mayhew's duties with regard to his TDEC certification, which he was required to hold. Although these duties are not specifically listed in his job description, the Sixth Circuit has repeatedly observed, even after *Lane*, that "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Alomari*, 2015 WL 5255139, at *8 (quoting *Weisbarth*, 499 F.3d at 544); *accord Garcetti*, 547 U.S. at 424–25 (noting that the listing of a task in an employee's job description is "neither necessary nor sufficient" to demonstrate that the task was actually within the scope of the employee's professional duties). Mayhew does not dispute that Smyrna required him, as Lab Supervisor, to hold a certification from TDEC, nor does he dispute that this certification required him to comply with all permit and reporting requirements, notify TDEC of any conditions that are "violative" of water quality standards, and exercise reasonable care to prepare reports that do not contain inaccurate data.

Regardless of these undisputed duties, Mayhew repeatedly argues that, "while reporting violations to TDEC on MORs and DMRs and to the EPA in sludge reports was part of

Mayhew's ordinary job duties, reporting Noble's conduct to Strange, Parker, Craig, and Gill was not." (Docket No. 37, p. 9.) In support of this argument, Mayhew points only to his own testimony to the contrary, including that "[t]his is something completely separate and outside my normal job official duties," and "reporting illegal activity . . . contained within the department is not part of my job description." (Docket No. 40-1 (Dep. M. Mayhew, v.1), 119:1–5; Docket No. 40-2 (Dep. M. Mayhew, v.2), 202:24–203:3). Because this is summary judgment, the court must construe the facts in the light most favorable to Mayhew, despite the fact that this self-serving testimony is the only evidence offered to support Mayhew's contention that he had no specific responsibility to report another employee's misconduct to his supervisors. Even assuming, however, that "reporting Noble's conduct to Strange, Parker, Craig, and Gill" was not on its own one of Mayhew's specific, ordinary duties, the court still concludes that the subject matter of the reports at issue here implicate Mayhew's other, undisputed duties.

Moreover, the court concludes that Mayhew's reports were made in a context that demonstrates they were made in furtherance of his undisputed job duties as described above. In fact, the impetus for Mayhew's reports appears to have been his discovery of a discrepancy in the data regularly calculated by the laboratory he oversaw, a discovery that he made while he was entering data into a record on his work computer, a task he regularly and personally performed.

The setting and audience of Mayhew's reports further support the conclusion that they were undertaken in furtherance of his ordinary job responsibilities. Mayhew reported his concerns up the chain of command, and, "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Fox*, 605 F.3d at 348 (quoting *Davis v. McKinney*, 518 F.3d 304,

313 (5th Cir. 2008)).[6]  Mayhew first spoke with his direct supervisor, Roberts, and he has

admitted that, at the time he went to Roberts with his concerns, he believed that he was working

within the chain of command.  Mayhew only began to report his concerns further up that chain of

command – to Roberts' supervisors, Parker and Strange – when Roberts was suspended.

Furthermore, Mayhew's reports to Parker and Strange regarding improprieties at the Plant took

place primarily during a series of interviews that Parker and Strange themselves had scheduled to

discuss the Plant's operations and personnel with Plant staff.  Finally, when he felt that these

reports were being ignored, Mayhew sent an email from his work email address to Parker and

Strange, "clarify[ing] and document[ing] issues at [the Plant]."  (Docket No. 33-2.)  Ultimately,

Mayhew ended up discussing these concerns with Gill, who, as Town Manager, directly oversaw

Parker and Strange.  Mayhew never discussed his concerns with TDEC, with the EPA, or with

any other outside agency.  Nor did he approach the press to discuss these concerns.  Although his

failure to speak to an outside agency or the press is not dispositive, *see Hughes v. Region VII

Area Agency on Aging*, 542 F.3d 169, 184 (6th Cir. 2008), in light of the other factors

considered, it weighs in favor of a finding that his speech was not protected by the First

Amendment.   Mayhew only escalated his concerns through work channels and up the chain of

command at Smyrna, supporting the conclusion that his reports of wrongdoing were undertaken

---

[6] Mayhew has argued that his reports to Strange, Parker, Gill, and Craig were "outside" of his chain of command (Docket No. 37, p. 22), but this is flatly contradicted by the record and undisputed facts.  Mayhew has conceded that his direct supervisor, the Plant Manager, reported to Parker and Strange as the Assistant Director and Director of Utilities, respectively.  (*See* Docket No. 38 ¶¶ 117, 128.)  Parker and Strange, in turn, reported to the Town Manager – Gill. (*Id.* ¶ 172–73.)  As for Craig, not only did Mayhew merely request that Parker and Strange forward his July 1, 2014 email to Craig instead of contacting Craig himself, but, as Smyrna's head of Human Resources, Craig is exactly the person to whom you would expect an *employee* such as Mayhew to report when concerned about job security, not a person to whom a *private citizen* would turn when concerned about the operation of the Plant.

in furtherance of his ordinary job responsibilities and that he was not speaking as a private citizen.[7]

In short, Mayhew's reports were made in furtherance of his ordinary responsibilities as Lab Supervisor. Mayhew alleges that Noble pressured him to hide violations of the Plant's NPDES permit by falsifying data and cherry-picking samples calculated and collected by the laboratory that Mayhew oversaw. His reports concerned data and test results regularly produced by the laboratory he oversaw, and he discovered that the data was being falsified, changed, or omitted in his regular review of laboratory records containing that data while he was at the Plant. When he discovered these discrepancies, Mayhew took his concerns regarding the data and Noble's behavior to his immediate supervisor, Roberts, and only escalated his concerns up the chain of command when Roberts was suspended and ultimately replaced with Noble, the very person about whom Mayhew was complaining. The court concludes that Mayhew's reports were made in furtherance of his ordinary responsibilities as Lab Supervisor, and those reports were, therefore, not protected under the First Amendment.

### B.  Mayhew's Statements Regarding the Promotions of Noble and Kyle Gill

Mayhew also argues that he spoke as a private citizen on a matter of public concern when, in his July 1, 2014 email, he complained about Gill "bypass[ing] normal hiring

---

[7] Mayhew also claims that he discussed the violations at the Plant with others, including others at the Plant (Lloyd Johnson and Aubrey Blanks) and others outside of the Plant (Dwight Jeans, his family, and an attorney). He has not, however, pointed to any evidence in the record – nor can the court locate any – suggesting that Gill was aware of Mayhew's discussions with anyone other than Roberts, Parker, and Strange. These discussions with others, therefore, could not have been a substantial or motivating factor in Mayhew's discharge that would demonstrate a "causal connection" between the speech and the adverse action, *see Mills*, 276 F. App'x at 418, and, therefore, are not material to this analysis.

procedures" and the "unfair and unequal practices in filling the two highest paid positions" at the Plant. (Docket No. 52, p. 4.) As a preliminary matter, the court notes that, while the factual allegations regarding Mayhew's concerns about the promotions are detailed in the Complaint (Docket No. 1 ¶¶ 11–14) and Mayhew's briefing (Docket No. 37, pp. 6–8), Mayhew did not explicitly argue that these complaints constitute a basis for his claim of First Amendment retaliation that is separate from, and independent of, his reporting of violations at the Plant until he improperly raised this argument in his Sur-Reply. For the first time in his Sur-Reply, Mayhew argues that his statements regarding the promotions are actionable on their own under the First Amendment. (*Compare* Docket No. 37, pp. 6–7 (originally arguing that Mayhew sent the July 1, 2014 email to "document his concerns" because he believed his reporting of violations at the Plant was being ignored, and he was "concerned about his job security"), *with* Docket No. 52, pp. 4–5 (later arguing that Mayhew sent the July 1 email to "protest[]" the violations of hiring policy and, for the first time, linking it to a "concomitant misuse of Town funds").) The gravamen of the Complaint is that the plaintiff was retaliated against for speaking out about water treatment processing and reporting violations, not about failure to adhere to hiring and promotion policies. This new theory truly tortures the language of the Complaint (Docket No. 1) and the plaintiff's articulation of his theory of the case set out in the Initial Case Management Order (Docket No. 11) and may not be injected into the case this late in the game.

Moreover, even if the court were to consider Mayhew's statements about the promotions to be a separate basis for Mayhew's claim of retaliation, they are not actionable under the First Amendment. Even though these statements – unlike the reports discussed above – may not have been made in furtherance of his ordinary responsibilities as Lab Supervisor, the speech is related to Mayhew's concerns about his ability to perform his job duties rather than a matter of public

concern. Like the question of whether a public employee spoke as a private citizen, "[w]hether the speech at issue involves a matter of public concern is a question of law for the court." *Rorrer v. City of Stow*, 743 F.3d 1025, 1047 (6th Cir. 2014) (quoting *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004)). Whether an employee's speech addresses a matter of public concern depends on whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community," as determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 146, 147–48 (1983); *accord Boulton*, 795 F.3d at 534.

Particularly important in determining whether speech is on a matter of public concern is the "point" or "communicative purpose" of the speech in question. *Boulton*, 795 F.3d at 534; *see also Farhat*, 370 F.3d at 592. In reading the July 1, 2014 email, it is apparent that its point or focus is (1) Mayhew's personal concern regarding his job security, and (2) Mayhew's dissatisfaction with Gill's decision to promote Noble when, according to Mayhew, Noble is not qualified for the position, Noble was responsible for an overall hostile work environment at the Plant, and Noble will continue to engage in the misconduct about which Mayhew has already complained and which – as discussed above – interferes with Mayhew's performance of his job duties. (*See* Docket No. 33-2.) First, the email itself reflects Mayhew's *private* concern that he will be replaced as Lab Supervisor. (*Id.* ("I feel [Noble] will retaliate against me as it is just his nature. This is why I feel it necessary to document.").)[8] Second, the complaints raised in the

_____

[8] The court notes that, in stating that the email reflects Mayhew's private concern about his job security, it is not attempting to discern Mayhew's underlying, subjective motive in sending the email, which the Sixth Circuit has stated courts should not do; rather, the court is evaluating Mayhew's communicative purpose from the language of the speech itself. *See Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003) (stating that courts should not attempt to "discern [the plaintiff's] underlying motive," but rather "evaluate her point as it is presented in the speech").

email – which, at their core, question a decision made by management based on Mayhew's prediction of probable bad consequences in the future – implicate internal office politics and sound in an internal employee grievance, which the Sixth Circuit has regularly concluded does not address a matter of public concern.  *See, e.g.*, *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 365 (6th Cir. 2007) (concluding that speech expressing an employee's concern that a negative incident could result from reduction in training for police canines was "nothing more than the quintessential employee beef" that the First Amendment does not protect (internal quotation mark omitted)); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412–13 (6th Cir. 1994) (holding that a press release issued by an employee stating that new work rules at a hospital might lead to patient endangerment is not protected by the First Amendment, because it is "nothing more than [an] example[] of the quintessential employee beef: management has acted incompetently"); *see also Garcetti*, 547 U.S. at 420 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" (quoting *Connick*, 461 U.S. at 154)); *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543–44 (6th Cir. 2012) (concluding that dismissal of a First Amendment retaliation claim is proper when the facts demonstrate that the speech at issue "has the ring of internal office politics").

To the extent that Mayhew's statements regarding Gill's alleged bypassing of "normal hiring procedures" could be a matter of public concern, the court notes that these statements are only tangential to Mayhew's speech, which focuses, instead, on his dissatisfaction with Noble's promotion and the likely consequences for Mayhew's job.  The Sixth Circuit has emphasized that speech that is only "incidentally conveyed" and  "passing" or "fleeting" references to an arguably public matter do not elevate the speech to a matter of "public concern," where the

"focus" or "point" of the speech advances only a private interest. *Farhat*, 370 F.3d at 592–93. As discussed above, the "focus" of the July 1, 2014 email is Mayhew's disagreement with Gill's decision to promote Noble, which advances Mayhew's private interest in his own job security. These few statements about irregularities in the promotion process do not transform the overall point and focus of the email and, therefore, do not make the contents of the email a matter of public concern.

The context of the July 1, 2014 email also supports a finding that the statements contained therein do not address a matter of public concern. Mayhew sent the email only to Parker and Strange, who eventually forwarded it to Gill. Mayhew's concerns, therefore, were raised only internally, and the mode of communication Mayhew chose was not one that would "bring to light actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148; *see also Armstrong v. Shirvell*, 596 F. App'x 433 (6th Cir. 2015) (noting that the "audience chosen for the speech [is] relevant to the public-concern inquiry" (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999))).[9] The court, therefore, concludes that Mayhew's July 1, 2014 email did not address a matter of public concern in content or context, and it is not protected by the First Amendment.

Accordingly, the court will grant summary judgment to the defendants on Mayhew's § 1983 claim for violation of his First Amendment rights.

---

[9] This context is primarily what distinguishes Mayhew's circumstances from those in *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888 (6th Cir. 2003). In *Banks*, the plaintiff sent multiple formal written complaints to the Kentucky Office of Education Accountability (the "OEA" – an independent oversight body created by the Kentucky legislature, Ky. Rev. Stat. Ann. § 7.410) regarding irregularities in the hiring process for primary teaching positions at an elementary school, for which the plaintiff had applied. Mayhew, on the other hand, sent his written complaints to the managers of his own department, indicating that his email was more akin to the typical internal employee grievance that is not protected by the First Amendment than the plaintiff's letters in *Banks*.

## II.     <u>Tennessee Public Protection Act Claim</u>

Because the court is dismissing Mayhew's § 1983 claim – his only federal claim – the court must decide whether it will exercise supplemental jurisdiction over Mayhew's remaining state law claim for violation of the TPPA.  There is a strong presumption against the exercise, under 28 U.S.C. § 1367, of supplemental jurisdiction over remaining state law claims once all federal claims have been dismissed, and residual supplemental jurisdiction should be exercised sparingly.  *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) ("[R]esidual supplemental jurisdiction [should] be exercised with hesitation, to avoid needless decisions of state law."); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").  The court, therefore, declines to exercise supplemental jurisdiction over Mayhew's remaining state law claim.

<u>CONCLUSION</u>

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge